LOUISE SILKOWSKI GUDAC

Plaintiff-Appellee

vs.

FRANKIE MARIANITO, ELDON HANSEN,
SHIRLEY PETE, Their Employees,
Agents, and Assigns

Defendants-Appellants

Decided On February 28, 1978

Marc S. Gladner, Judicial Branch of the Navajo Nation, Window Rock, Arizona, for Plaintiff-Appellee

John A. Chapela, Legal Department of the Navajo Nation, Window Rock, Arizona, for Defendants-Appellants

Before JOHN, Acting Chief Justice, and BLUEHOUSE and WALTERS, Associate Justices

JOHN, Acting Chief Justice:

I.

On January 18, 1977, Chief Justice Virgil L. Kirk, Sr., agreed to employ the Plaintiff in the capacity of Judicial Branch Fiscal Officer, effective January 24, 1977. By memorandum, the Chief Justice requested that the Defendant Frankie Marianito process all the necessary papers. The appropriate personnel action form was prepared by the Judicial Branch and signed by the Chief Justice and it bore the notation "90 Days Probationary Period" in the remarks section.

On April 12, 1977, the Defendant Frankie Marianito wrote

the Chief Justice that the Plaintiff's employment would be terminated on April 22, 1977, because she was hired temporarily. His letter referred to a memorandum from Thomas H. Brose, Director of the Divison of Equal Employment Opportunity, to Marianito stating that the Plaintiff's employment was temporary, that Indian preference would have to be observed and that the nepotism provisions of the Executive Branch's personnel policies were being violated by Mrs. Gudac's employment at the Judicial Branch.

Apparently, Brose based his opinion that the Plaintiff's employment was temporary on a personnel action form which stated that to be the case. However, the form Brose saw did not bear the signature of the Chief Justice as did the form originally submitted by him. Therefore, this form, with its changed notation, must have been substituted by someone outside of the Judicial Branch at some time subsequent to the plaintiff's employment.

On April 13, 1977, Chief Justice Kirk wrote Marianito that the Plaintiff's employment was not temporary and that the personnel policies of the Executive Branch did not apply to the Judicial Branch. Therefore, he stated, Mrs. Gudac was not to be terminated by any action of the Personnel Office.

When it appeared that the Defendants would proceed to terminate the Plaintiff without the consent of the Judicial Branch, Mrs. Gudac, on April 15, 1977, filed an Application for a Temporary Restraining Order and Permanent Injunction to prevent her termination

by Executive Branch officers.

On that same day, the Window Rock District Court issued the requested order, preventing the Plaintiff's termination. On April 21, 1977, after a full hearing, the Window Rock District Court issued a Permanent Injunction preventing any and all of the Defendants from acting individually or in concert to terminate the Plaintiff. The Court found that the Plaintiff would suffer irreparable harm if the injunction were not issued. The Court further found that the personnel policies and procedures of the Executive Branch did not apply to the Judicial Branch and the Court enjoined the Defendants and their successors from ever applying them to Judicial Branch personnel.

On May 20, 1977, the Defendants filed a Motion to Correct Error and to Dissolve the Injunction. This motion was denied on June 8, 1977.

On May 23, 1977, the Defendants filed this appeal and oral argument was heard on November 14, 1977.

II.

The issues presented by this appeal can be summarized as follows:

1. Do the personnel policies and procedures which Mr. Marianito sought to enforce as to Mrs. Gudac apply to the Navajo Judiciary?

2. Was injunctive relief appropriate and was the scope of the injunction proper?

3. Were Rules 6 and 7 of the rules of Court properly interpreted by the District Court?

4. Who does have the authority to control personnel matters of the Judicial Branch of the Navajo tribal government?

III.

The District Court was absolutely correct in ruling that the personnel policies and procedures of the Executive Branch do not apply to the Judiciary. These policies are often referred to as "tribal" policies. They are not.

Resolution CAU-50-59, passed August 6, 1959, delegated to the Advisory Committee of the Navajo Tribal Council the authority to approve personnel policies for the Executive Branch of the Navajo tribal government. The legislative history behind this act and terms of the act itself make it perfectly clear that this authority was intended to extend only to the Executive Branch, headed by the Chairman of the Council, and that the phrase "Executive Branch" was purposefully used to distinguish it from the Judicial Branch, which was then in existence and was then specifically referred to by the Council and the Code it had recently enacted in those terms: Judicial Branch.

On December 18, 1959, the Advisory Committee adopted a resolution, ACD-173-59, approving personnel policies for the Executive Branch. ACD-173-59 made clear and specific reference to the authority delegated to the Committee by CAU-50-59.

At no time did any Council or Committee member suggest

that the policies then being adopted (which are substantially the same ones defendants attempted to enforce as to the Judiciary) would ever apply to the Judicial Branch of the Navajo Nation.

The fact is that no one in the Executive Branch attempted to apply these policies to the Judiciary until 1974, when Mr. Marianito's predecessor attempted to bring the Judges of the Courts of the Navajo Nation within a new administrative ruling concerning carry-over of leave. At this time, the Chief Justice and the General Counsel to the Judicial Branch informed the Executive Branch and its Legal Department that such efforts were in violation of the law. At first, the Legal Department agreed and issued an advisory opinion, dated May 8, 1974, to this effect. As a result of political pressure from within the Executive Branch, this opinion was subsequently withdrawn in September of that same year. The second opinion erroneously interpreted both CAU-50-59 and ACD-173-59 and was apparently based on a misquote of ACD-173-59 as well as a deliberate misrepresentation of CAU-50-59.

This dispute did not end but in fact found expression in letters sent by Mr. Marianito to certain judges in November of 1976. The termination of Mrs. Gudac was but a continuation of a long-standing argument between the Judiciary and the Executive Branch of the Navajo government.

We note with interest that the policies of the Executive Branch do not actually give the Director of Personnel the right to

terminate Executive Branch personnel, let alone Judicial personnel. In addition, these policies define "nepotism", which was one of the bases of the illegal firing, only in terms of employment within the same office or division. Numerous Executive Branch personnel married to each other work within the same office and division, not to mention the fact that many more couples work in different offices and divisions of that branch.

Apparently, the Executive Branch refuses to recognize the fact that the Judicial Branch of the Navajo Nation is itself composed of various offices and districts. Given this fact, the plaintiff's employment would not have been in violation of these policies even if they had applied. We realize that counsel for Appellants has placed heavy reliance on the manner in which the Fiscal Year 1977 budget described the organization of the Judiciary, but this is a matter over which the Judiciary seems to have no control since one of the defendants is the person who sees to the printing of the budget. We are well aware that no matter what the Judiciary submits to the Budget and Finance Committee and the Council in terms of budget justification of its organizational structure, the Controller will restructure the budget format to suit his perception of the Judiciary. This budget format therefore cannot be controlling of the organizational structure of the Navajo Judiciary.

In any case, it does not matter, because we hereby affirm the District Court's ruling as to the applicability of the Executive Branch's personnel policies to the Judicial Branch.

We further rule that the Indian Civil Rights Act of 1968 precludes the application of any personnel policies administered by the Executive Branch to the Judiciary because such a system would make it impossible to guarantee the independence of the Judiciary and therefore impossible to guarantee the rights secured by the Indian Civil Rights Act itself, except by litigation in federal court. We cannot accept the notion that this Tribe would ever concede that such a situation should come about. Tribal sovereignty would have no meaning were this Court to analyze the situation any other way.

IV.

Injunctive relief was appropriate in this case and the scope of the relief granted was proper. Counsel for Appellants agreed in oral argument that no standards exist by which Appellee's damages could have been measured. Indeed, the situation was most peculiar and difficult to analyze in terms of damages because plaintiff had assumed the position of Fiscal Officer for the Judicial Branch knowing that the pay was inferior to her normal standards. Any damages would have been nearly impossible to assess. Determining the extent of the injury would have been further complicated by the fact that it was not plaintiff's employer who terminated her but someone outside the Branch.

We will not lecture counsel for Appellants on the law. We refer him to the cases on the appropriateness of injunctive relief. See, Luckenbach S. S. Co. v. Norton, 21 F.Supp. 707 (D.C., Pa.); General Electric Co. v. Local 997 United Auto Workers of America,

8 Ill.App.2d 154, 130 N.E.2d 758; <u>Winslow v. Fleischner</u>, 110 Or. 554, 223 P. 922; <u>W. L. Matthews v. J. F. Rodgers</u>, 284 U.S. 521, 52 S.Ct. 217, 76 L.Ed. 447; <u>Eastwood v. Eastwood</u>, 167 Kan. 471, 207 P.2d 393; <u>Wyman v. Jones</u>, 123 Colo. 234, 288 P.2d 159; <u>Koussevitzky v.Allen, Towne & Heath</u>, 27 App.Div. 759, 69 N.Y.S. 2d 432; <u>Monson v. Tussauds, Ltd.</u>, 1 QB 671 (1894).

The scope of the relief was proper given the obstinate nature of certain Executive Branch personnel and the fact that this dispute had actually been going on for some years. Had the injunction not included successors, the Chief Executive Officer could merely have switched personnel and thereby brought everyone out from under the order. Since the District Court had determined that there was (and can be) no authority for the actions taken by Executive Branch personnel against the Judiciary, no rights of the Appellants or their successors are abridged by the scope of the ruling. In any case, these Appellants have no standing whatever to raise the issue as to their successors. See, <u>Crystal Pier Amusement Co. v. Cannan</u>, 219 Cal. 184, 25 P.2d 839, 91 ALR 1347.

V.

Counsel for Appellants has raised the claim that representation of the Plaintiff-Appellee by Mr. Stephen M. Gudac and Mr. Marc S. Gladner represents a violation of Rules 6 and 7 of the Navajo Rules of Court.

Rule 6 requires persons practicing before our courts to have passed the Navajo Bar examination. Mr. Gudac and Mr. Gladner, respectively as General Counsel and law clerk to the Judicial Branch, have prepared and administered all of the bar examinations thus far given. They have done so at the express command of the Judges of the Navajo Nation because no other avenue of implementation of the recently adopted Rule 6 was available, the Bar Association being completely unorganized. Indeed, since the first Navajo bar examination ever given was conducted in December of 1976, there really was no one else available to draft and administer it. It should be obvious to any sensible person that Rule 6 was never meant to apply to these two attorneys. In addition, our General Counsel's contract requires him to defend the interests of the Navajo Judiciary and that is sufficient basis for us for admitting him to practice in our courts when he is defending the interests of the Judiciary.

We fail to understand why this question was ever raised except in the hopes that plaintiff could not otherwise afford competent counsel or in the expectation that no one else could competently litigate this case. Usually, attorneys do not concern themselves with whether opposing counsel is a member of the bar; indeed, if they are not, counsel admitted to a particular bar generally motions in opposing counsel. The pettiness of the argument seems to be a matter of "clutching at straws" in a hopeless case.

The argument raised by Mr. Chapela as to Rule 7 is similarly weak. Rule 7 prohibits Judicial employees from representing

private parties in suits before the Navajo courts. It is absolutely foolish to claim that this rule is applicabe to a suit brought by a Judicial employee in her <u>official</u> capacity and raising issues of substantial interest to the Judiciary. The intent of this rule is clear and nothing more need be said about it. We do note that Mr. Chapela sought to raise this issue on appeal when he had not raised it at the trial below. Perhaps counsel should himself re-learn the Rules of Appellate Procedure, as they are universally written. Issues not raised at the trial below are not "appealable".

VI.

The last questions we must examine is that of who does control the personnel policies of the Judicial Branch of the Navajo Nation. The answer is that the judges do, and only the judges.

Except for Title 7, Section 254 of the Navajo Tribal Code, which grants the judges collectively the authority to create new positions, the Code is silent as to this matter, And for good reason it is silent. When the Judicial Code was being drafted, it was understood by everyone that the Judiciary would have to be free to set its own personnel policies. This is why 7 N.T.C. 254 was included. This section provided for the growth in staffing of the courts and left such policy decisions to the judges collectively. All other personnel matters were left to the decision of the judges individually or collectively, depending on the nature of the policy considerations.

That this was the intent of the Council is clear from the omission of the Judiciary in Council Resolution CAU-50-59. The Navajo Tribal Council sitting at that time was receiving sound legal advice and was making decisions ahead of the trend of the law.

Subsequently, in 1968, the Indian Civil Rights Act, 25 U.S.C. 1302, was passed by the United States Congress. In our opinion, this law precludes any other system except what we here have described. The Judiciary must be free to control its own personnel and personnel policies if the courts are to remain free from political pressure. Indeed, such problems, as the legislative record surrounding the passage of this acts shows, were a major element in causing the passage of that act. We must rule that the Indian Civil Rights Act requires that Indian courts exercise independent control over their personnel. No other analysis is possible if any effect is to be given to the spirit of this law.

The notion of collectivity is one which arises because of the nature of our judicial system. We expect uniformity in personnel policies and procedures as a matter of good judicial administration, equity and common sense. The creation of new positions is certainly something which requires a concensus among the judges. The position of Fiscal Officer (and, for that matter, of General Counsel) is one not mentioned in the Code.

It was not anticipated in 1959 that the Judicial Branch would be colleting almost $600,000 in fines and fees, contracting with

various state and federal agencies for amounts approaching a total of $400,000 and operating on a budget of nearly $900.000.

Court finances have gotten complicated, yet the responsibility for these funds still lies primarily with each District Judge and his Chief Clerk. This position of Fiscal Officer is one that can only be created to serve and assist the judges and their staffs in carrying out their duties.

This becomes obvious when the caseload is analyzed: the district courts handle about 34,000 cases a year, the Court of Appeals about 30. Certainly then, no one could argue that the Fiscal Officer is hired primarily for any purpose other than to provide technical assistance and support services for the district courts. The other functions of the Officer of Fiscal Affairs are incidental.

The fact that the judges collectively do have the right to control personnel policies, to create new positions and to develop the budget each year was made clear by the Budget and Finance Committee of the Navajo Tribal Council when the Fiscal Year 1978 budget was being submitted to them for approval. They refused to make the changes in staffing and funding requested by the Chief Justice unless such changes were first approved by a vote of all the judges.

We therefore now rule that the ultimate authority over all Judicial Branch personnel matters rests with the Chief Justice and District Judges collectively and that no system which may purport to place

such matters under the control of any outside agency or in any one person's hands is legal under tribal lw and 25 U.S.C. 1302.

For all of the reasons set forth above, we hereby AFFIRM the decision of the Window Rock District Court.

BLUEHOUSE, Associate Justice and WALTERS, Associate Justice, concur.